Filed 1/13/15  In re Naomi S. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re NAOMI S., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> E.B., <br><br> Defendant and Appellant. | F069430 <br><br> (Super. Ct. No. 516585) <br><br> **OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Law Offices of Johnson & Johnson and Carin L. Johnson for Defendant and Appellant.

John P. Doering, County Counsel, and Maria E. Ratliff, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Mother E.B.'s parental rights were terminated and minor Naomi S. was determined to be adoptable. On appeal, mother argues her modification petition was properly before the juvenile court pursuant to Welfare and Institutions Code[1] section 388 and that she met her burden of showing both changed circumstances and a change in placement were in the best interests of the child. Further, she contends substantial evidence did not support the juvenile court's termination of her parental rights because the parent-child benefit exception should have been applied. Mother also asserts certain visitation conditions denied her a meaningful bond with her child. Lastly, she contends subdivision (h)(1) of section 366.26 violates the constitutional protections afforded by the equal protection clause. We will affirm.

**RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**[2]

*Prehearing Events*

A detention report filed February 7, 2013,[3] by the Stanislaus County Community Services Agency (agency) states the following: Naomi was born in November 2012. On January 10, she was brought by ambulance to Emanuel Hospital "because she had stopped breathing." Mother and M.S. (father), Naomi's father, were directed to take Naomi to Madera Children's Hospital (MCH), and the child was "discharged with a diagnosis of reflux and was provided with medication."

On January 28, Naomi was again transported to Emanuel Hospital by ambulance "for not breathing." Following a CT scan, which showed "new and old bleeding on the

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]The facts and procedural history are taken from our nonpublished opinion in *E.B. v. Superior Court*, case No. F068570, dated March 13, 2014, and are supplemented with subsequent facts and procedure thereafter.

[3]Except as otherwise indicated, all further references to dates of events are to dates in 2013.

brain," she was again taken to MCH where she underwent surgery. The postoperative diagnosis was "large subacute subdural hematomas bilaterally," and further evaluation revealed Naomi had also suffered "bilateral retinal hemorrhages." The physician who performed the operation "reported that Naomi is a victim of shaken baby syndrome," and informed mother and father that Naomi had suffered a "traumatic injury" caused by "someone."

As of February 7, neither mother nor father "ha[d] been able to provide an explanation" as to how Naomi suffered her injuries. On February 5, mother told a social worker the following: On January 10, "the father was alone with the child and … had left her in the swing with the bottle propped up. When he returned to the room soon after, [Naomi] had stopped breathing and was beginning to turn purple." On January 28, Naomi "woke up crying as if she was in pain," fell asleep again, awoke again, and "was breathing very shallowly."

A report filed by the agency on April 3 (April 3 report), in advance of the jurisdiction hearing, stated the other members of the household—Naomi's maternal grandparents and maternal aunt and uncle—were interviewed, and "no other explanations [of the cause of Naomi's injuries] were produced." On February 5, Naomi was taken into protective custody. A section 300 petition was filed on February 7, and on February 8, the court ordered Naomi detained in foster care.

The April 3 report further stated: As to the January 10 incident, father stated he "may have set [Naomi] down too hard onto the ground." The physician who treated Naomi at MCH on January 10, and was the "child abuse doctor on call" when Naomi was brought back to MCH on January 29, opined Naomi's injuries were "highly indicative of non-accidental trauma" and "had to have been" caused by "violent shaking," and that her "hematomas alone could not have been caused from setting the child down too hard."

On February 8, the agency referred mother to Sierra Vista Child and Family Services (Sierra Vista) for parenting classes, individual counseling, and a clinical

3.

assessment. By April 3, mother had completed three parenting classes and had undergone a clinical assessment. She completed her parenting classes on May 16.

On March 4, it was learned Naomi had also suffered a fractured tibia. The examining physician "could not date" this injury, which "was healing." Mother and father "have been cooperative with the Agency, other than providing … a viable reason to how [*sic*] the injuries [to Naomi] occurred …." "[B]ecause of the severity of the injuries and the lack of an explanation as to the abuse of Naomi, the Agency … recommend[ed] that the parents be denied reunification services …."

On May 21, an amended section 300 petition was filed.[4] On June 11, at what was apparently a combined jurisdiction and disposition hearing, the court found the allegations of the amended petition true, adjudged Naomi a dependent child (§ 300), ordered her removed from the custody of her parents, and ordered the agency file a case plan with the court within 10 days. The court's written order stated that "[t]he extent of progress which has been made toward alleviating or mitigating the causes necessitating placement has been," for both mother and father, "good."

On June 21, the agency filed a case plan, which included the following two service objectives: (1) "The parents shall identify the perpetrator and be protective." (2) "The parents shall recognize the injuries to the child were not accidental and shall explain the causes of the injuries consistent with the medical findings." On July 9, the court ordered the second of these objectives amended to delete the words "and shall explain the causes of the injuries." On July 31, the court filed the amended case plan with the ordered modification so that the modified objective read: "The parents shall recognize the injuries to the child were not accidental consistent with the medical findings."[5]

_____

[4]A January 29 social worker's case log note states "[Naomi] was transported to [MCH] due to a skull fracture," and it was alleged in the initial petition that Naomi had suffered a skull fracture. However, a January 29 physician's note states there was "no evidence of fracture on CT of the head." The allegation of a fractured skull was deleted in the amended petition.

[5]We sometimes refer to this treatment plan objective as the recognition objective.

Clinical psychologist Edward A. Moles conducted the psychological evaluation, meeting with mother on July 30, August 14, and September 3. In his report, faxed to the agency on September 6, he stated the following: Mother stated that on January 10 she had left Naomi with father, who told mother later that he had left Naomi on the swing and that when he returned she was turning blue. When Dr. Moles asked mother if she thought father "had done something to Naomi," mother "seemed confused about [father's] responsibility in this and seemed to want to believe that he did nothing wrong." Mother was "hesitant to accept" that father was responsible for Naomi's injuries. "Her need to maintain the relationship with her husband appeared to be a primary concern." Mother "has acknowledged that her husband must have done something to injure their child," but "she has done nothing to engage in behavior reflecting this concern and seems passively accepting of him and his story." Mother reported she, father and Naomi moved out of her family's home in May and into their own home.

Dr. Moles opined the failure of mother and father to account for Naomi's serious injuries is "striking," and with such injuries and "no understanding of causation[,] there is a significant concern that the injuries would continue if [Naomi] is returned [home]." Dr. Moles recommended Naomi not be returned to mother unless mother "is in a stable independent living situation separate from [father]," and that she "continue the parenting and individual counseling services at Sierra Vista."

In August, Maryanne Cose, mother's counselor at Sierra Vista, in an e-mail to agency social worker Christine Shahbazian, stated mother "feels that the injuries [to Naomi] were a result of [father] performing CPR."

A status review report authored by Shahbazian and filed October 18 states the following: Shahbazian met with mother on September 10. Mother had prepared a written "general" plan for keeping Naomi safe. When asked how the plan was "specific to Naomi's injuries," mother stated she was "leaving" father and moving back in with her family. She requested "separate visits from [father]." She had not previously informed

5.

her counselor at Sierra Vista of her plan to leave her husband "as this was a new decision." When asked "why she made this decision now," mother responded "she had been confused before." Throughout this meeting mother "indicated she believed [father] was responsible for Naomi's injuries."

Also on September 10, Naomi's foster mother telephoned Shahbazian and told the social worker that on the previous day, mother had stated "she was going to blame her husband, move back with her parents and then get Naomi back," and that thereafter "she would move back with her husband and be a family again."

On September 24, Shahbazian spoke with mother by telephone. When the social worker told mother that Naomi's foster mother had reported mother's professed intention to move back in with father, mother "stated this was not true; those words never came out of her mouth." Mother also "indicated the injuries were nonaccidental and she believed her husband was responsible but she didn't know what happened as the injuries happened while [Naomi] [was] in [father's] care on [January 10]."

On September 26, Shahbazian met with father, who stated that "he and his wife no longer see each other or call each other."

Also on September 26, Shahbazian again met with mother. Mother stated the following: "[S]he believed that on [January 10] [father] propped Naomi up with a bottle and left her unattended causing Naomi to choke and stop breathing." Father told mother "he bounced [Naomi] [to] get her breathing again," and mother believed "that is what caused the injuries." When asked about Naomi's broken leg, mother "clarified it was a fractured foot and indicated the doctor told her that Naomi's foot could have easily hit something and broke." Mother also reported "she was moving out of her parents' home and obtaining her own residence."

At some point, apparently during the September 26 meeting, Shahbazian asked mother if she could "appreciate the difference" between a person "shak[ing] a baby to

6.

stop the baby from crying" and shaking a baby "out of … frustration."  Mother responded, "there is no difference and that one should never shake a baby."

Shahbazian concluded:  "The nature of the injuries to Naomi and [mother's] belief that her husband injured Naomi by bouncing her to get Naomi to start breathing are not consistent with medical findings, nor does [mother] understand the nature of the injuries being nonaccidental."

Cose, in a letter to Shahbazian dated October 9, indicated Cose's last contact with mother was a counseling session on October 8 and stated mother "had difficulty acknowledging who injured her daughter and how the injuries occurred."  Cose reported mother had repeated father's account in the first incident that he had "propped the bottle up to feed Naomi when she began to choke and stop breathing."  As to the second incident, mother stated she "noticed that [Naomi's] breathing was 'not right' and yelled for [father]," and she "believed that [father] attempted to startle Naomi by 'bouncing' her to help her breath[e]."  Cose further reported mother stated "as of September 10, 2013 she has separated from her husband" and that she is willing to seek a restraining order and obtain a divorce "if this would help prove she is serious about the separation."

### Six-month Review Hearing

The six-month review hearing was conducted over three days:  December 9, 10, and 12.

Naomi's foster mother testified to the following:  She is, and has been since June 2013, Naomi's foster mother.  In the latter part of September, she saw mother and father together in a Wal-Mart Store in Patterson, walking next to each other as mother pushed a shopping cart.  In the early part of October, she saw mother and father together, traveling in a car in Patterson; father was driving.

The foster mother further testified that on September 9, she was with mother at a doctor's appointment, and mother said "she [mother] needed to announce that someone had done it, she had left [father] and was moving in with her parents."  While in the

7.

examination room waiting for the doctor, mother telephoned father, and said to Naomi, "'Say hi to Daddy. Daddy it's your baby.'"

Cose testified to the following: The purpose of her counseling of mother was to "address [the] objective" of the case plan that mother "identif[y] who the perpetrator was, acknowledg[e] that her baby was non-accidentally injured, com[e] to terms with safety for herself and her child." Cose's most recent counseling session with mother was on December 5.[6] Since September 10, when mother told Cose she had "decided to dissolve the relationship with [father]," mother was "making progress now" compared to "the beginning of services." She is now "towards the end of the beginning, in the middle [stage of that progress]. She's coming along, but it's just taken a little while." Her "progress" consisted of "a safety plan on how she will help keep her daughter safe," but because she does not have custody of Naomi, she has not been able to "put [the safety plan] into action." Mother "reports that she believes [father] had shaken [Naomi]." On December 5, mother showed Cose "actual paperwork" proving she had filed for dissolution of marriage. That mother said she was leaving father shortly after Dr. Moles recommended Naomi not be returned to mother unless she was living separately from father "leaves [Cose] to question if [mother's] decision was a result of the psychological evaluation conducted by [Dr.] Moles or if it was her decision for herself and her baby." That mother "is saying … she has the intent of having no contact" with father, but "then is seen out in the community with him" indicates mother "may be confused [as to] what she wants."

On December 4, mother spoke with Cose on the telephone and told her about an incident in Patterson that involved "shoving." At their in-person discussion on December 5, mother stated she had gone to father's home "to confront him about financial matters," at which time father "pushed" her and she "pepper-sprayed" him.

---

[6]Cose testified on December 9.

Cose did not know whether father pushed her before or after mother pepper-sprayed him. Thereafter, mother stated father "showed up with a golf club" at mother's home and "attempted," unsuccessfully, "to break windows." Also on December 5, mother stated that when she was pregnant, father threw a "light" box "at her stomach." This "really upset" mother.

At some point prior to December 4, mother stated she would seek a restraining order against father, "if she needed to." At that time, Cose gave mother "information to contact Haven[7]." Cose also contacted Haven while mother was in Cose's office "so that she could have an outside resource to help her if necessary."

"[A]s of yet," Cose had not addressed with mother in counseling the question of "how mother could safely interact with [father] if they needed to discuss any [coparenting] issues." In the event services were continued, that was "something [Cose] would continue to work with mother on."

Mother "mentioned [to Cose] that she need[ed] help to stay away from [father]," and Cose "explained to her that … she could benefit from having stronger boundaries." Mother "agreed … and said that she needed help in doing so." When asked if she had discussed with mother "[mother's] judgment and appropriate boundaries," Cose responded: "Not to the degree that it needs to be. A majority of the focus has been on [mother] dealing with her emotions and dealing with [father] regarding the separation and the feelings that she's been having around that."

On December 9, Shahbazian testified to the following: She is the family reunification worker assigned to mother's case. Prior to December 3, mother had consistently stated she believed Naomi's injuries occurred when she had stopped breathing and father, in an effort to revive her, "bounced" her. But on December 3 she reported for the first time that father "shook [Naomi] because he was mad."

_____

[7]Apparently a shelter or some other kind of facility that provides assistance to domestic violence victims.

9.

Mother stated "she had no contact with [father]." However, later in the one hour and 45 minute discussion, "when pressed," she stated "a couple of weeks" before, she had gone to father's home to discuss an overdraft on their joint bank account, at which time he pushed her and "slam[med] the door on her, hitting her with the door," and she pepper-sprayed him. Later, father saw her driving around and "threatened to break a window."

Shahbazian did not provide mother with a domestic violence referral after mother told her about this incident because, as mother recounted the incident, it was "more of poor decision-making and mutual combat" rather than a "domestic violence situation." Mother never told Shahbazian about the incident in which father threw the box at mother's stomach while she was pregnant. Prior to December 3, Shahbazian asked mother "multiple times" if she had "any … concerns with regard to father's propensity for violence or anger," and she consistently responded that "she never saw any anger or temper or issues with violence."

Mother testified to the following: "[S]ometime in September," she "came to the conclusion" that father caused Naomi's injuries when he "shook [her] violently." She "wasn't physically present to see" how Naomi was injured and initially "didn't think [father] actually caused these injuries." Prior to the point in September when she reached her conclusion, she "didn't think that [father] actually caused these injuries," and she "wasn't completely sure … if it was an accident or non-accident, and that's what [she] struggled with to understand." It took her until September to reach the conclusion she did because, she explained: "My daughter, I have to think about her. I have to be a mother first. And it took me a long time, and it was a process. It wasn't something easy for me."

On September 10, mother moved out of the home she was sharing with father. On September 9, when she told father she was moving out, he told her "basically to put [her] foot up [her] ass," that "he was going to do anything that was possible of him to keep

10.

[her] away from [Naomi] and that he wasn't going to let [mother] keep [Naomi]." Father also told mother, "'I know where your family lives ….'"

At the conclusion of the hearing, the court stated: "[M]y real concern throughout … this trial is that [mother] is really paying lip service to what she is supposed to say and what she is supposed to believe, but I don't believe her actions really support that belief." The court found it "troubling" that mother, who was separated from father at the time of the jurisdiction hearing, chose to move back in with him after the disposition hearing, "when he very likely was the perpetrator of the injuries [Naomi suffered]." The court was "also very concerned about mother's protective capacity, because she seems to be really lacking in good judgment," as evidenced by going to father's home in November, after father had threatened her in September, and confronting him about a bank overdraft. Mother's behavior "makes [the court] believe that maybe the foster parents [*sic*] are correct, that [mother] did say that I'm going to get Naomi back and we're going to be together in one big happy family." The court "can't help but feel that maybe [mother is] playing a game on this Court and saying what she thinks everybody wants to hear, but not really feeling that way truly in her heart."

The court found mother had "participated regularly" but had "[not] made substantive progress in the case plan." The court also found "by clear and convincing evidence that reasonable services were either provided or offered to the parents" and stated it was "not convinced that there is a substantial probability that Naomi could be returned to [mother's custody by the time of the 12-month review]."

*Subsequent Proceedings*

Following a notice of intent, mother filed an extraordinary writ petition with this court on January 23, 2014. We denied that petition on the merits.

The juvenile court denied mother's section 388 petition on April 11, 2014. Contested proceedings pursuant to section 366.26 commenced immediately and were held on April 11 and 17, 2014. Mother, maternal grandmother, the social worker and

11.

foster parents all testified.  The juvenile court found that no beneficial parent-child relationship existed between mother and Naomi, and that Naomi was likely to be adopted.  It then terminated mother's parental rights.

On April 17, 2014, mother filed a petition for writ of mandate with this court.  We summarily denied the petition that same date.

On May 22, 2014, mother filed a timely notice of appeal.

## DISCUSSION

### I.  The Section 388 Petition

Mother argues the juvenile court erred when it denied her petition alleging a change of circumstances.  The agency counters the juvenile court did not abuse its discretion in summarily denying the petition.

### A.  The Relevant Proceedings

On April 11, 2014, after some discussion about the manner in which the JV-180 request to change court order was presented, the court considered its merits:

> "THE COURT:  All right.  In any event, the Court has read and considered the noticed motion, and the Court also received faxed copies.  I have to say the photographs are basically worthless to the Court, but the Court has read and considered it.  [¶] … [¶]

> "[MOTHER'S COUNSEL:]  I have additional information that I can provide this Court in regard to an offer of proof as to Ms. Cose.  She was on vacation last—I think it was last week, and I wanted to get more information from her.  So because she was on vacation for a week, I couldn't reach her, so I talked to her on the phone.  I have additional information I would add to the JV-180 in regard to an offer of proof.  I do plan on calling her to testify if the JV-180 is granted, if the prima facie is granted by this Court.  Would you like to hear that?

> "THE COURT:  Sure.  Go ahead.

> "[MOTHER'S COUNSEL]:  Okay.  The offer of proof would—in addition to the letter that was submitted on the JV-180 would indicate that Ms. Cose has been a therapist for quite some time.  … And she has worked in the area of the dynamics of domestic violence.

12.

"She would testify that back in December, before she was called to testify, she was supporting more time for the mother and the child. She sees common domestic violence characteristics in her discussions with the mother since they began talking about domestic violence. The mother is trustworthy, and it took her a while to get to the domestic violence issues, but she's glad she did. She sees the characteristics of domestic violence as [mother] discusses these issues with her in the relationship she had with her husband.

"As she sees it now, there is a change. She says that the mother is much more understanding of the dynamics of domestic violence, which means that there is a change in the mother. She's just driving on a different road now is what she said, which I thought was very insightful. I've never heard anybody say that before.

"THE COURT: Very what?

"[MOTHER'S COUNSEL]: A very insightful way to explain the change of the mother.

"And I would call Ms. Cose to testify to these things if Your Honor—I would ask that Your Honor consider these things in addition to the JV-180 documentation I've provided to the Court in order to establish a prima facie case for a hearing. [¶] And that's my position. [¶] … [¶]

"THE COURT: Well, while counsel is looking [for color photographs], I'll hear from the Agency as far as their response—its response to the noticed motion.

"[AGENCY'S COUNSEL]: We would object. We're ready to proceed today [on the section 366.26 hearing]. We don't believe there has been good cause showing.…

"THE COURT: And, [minor's counsel]? [¶] … [¶]

"[MINOR'S COUNSEL:] [T]he prima facie as to the 388, I don't know if there's been a showing of good cause why it's in the best interest of the child to reopen services.

"THE COURT: [Father's counsel], do you have any position in this matter?

"[FATHER'S COUNSEL]: Well, yes, Your Honor. I think the Court really should hear the 388 petition.… [¶] … [¶]

13.

"And the standard for a 388 for the Court to hear it is just the barest prima facie showing, and the legislature and the courts in particular generally favor that at this juncture because the consequences are so severe. [¶] … [¶]

"THE COURT:  Well, it was filed back in—well, in any event, the situation is this:  That I have read and considered the 388 that you submitted to this Court, and I have now—and I'll return your original.  I have now also been able to look at clear copies of the photographs.

"And the reality is is that, even if I had received the 388 last week or the week before, I would have denied the 388.  And the reason why I would have denied the 388 is that, in this Court's opinion, it does not show that there has been a significant change of circumstances, nor does it show new evidence.

"And the reason for that is, at the time of the last hearing, the Court was already aware that [mother] had indicated that she had filed for divorce.  I was aware that she had indicated that she had obtained a restraining order and was living independently.  The only thing that really is different is that since that time, she's seen Ms. Cose an additional three times.  Ms. Cose indicates that the mother seems to be gaining understanding of the dynamics of abuse, but in this Court's opinion, that would be evidence simply of some change in circumstances, but not changed circumstances.

"So, in any event, I would have denied the 388, finding that it is not in the best interest of the child.

"[MOTHER'S COUNSEL]:  Did you consider the offer of proof that I indicated today?

"THE COURT:  Yes, I did.

"[MOTHER'S COUNSEL]:  Where she said there has been a change? Ms. Cose said there's been a change.  'Now there is a change' is exactly what she said.

"THE COURT:  But even if there has been some change, at this point, given the fact that services have been terminated, the Court has to consider the best interest of the child.  And the Court is taking all that into consideration, and the 388 is denied.  So we will proceed with the .26 hearing today at 1:30."

14.

**B. Analysis**

Any party to a dependency proceeding may petition the court to modify or set aside a prior order on the grounds of change of circumstance or new evidence. (§ 388, subd. (a).) The party must also show the proposed change would promote the child's best interest. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.) Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion. (*Id*. at p. 318.) The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. (*Id.* at pp. 318–319.)

Further, all conflicts in the record must be resolved in favor of the juvenile court's decision and all legitimate inferences indulged in to uphold that decision. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. (*In re Stephanie M*., *supra*, 7 Cal.4th at p. 319.) The procedure under section 388 accommodates the possibility that circumstances may change so as to justify a change in a prior order. (*In re Marilyn H*. (1993) 5 Cal.4th 295, 309.)

> "Under section 388, a party 'need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' (*In re Marilyn H*., *supra*, 5 Cal.4th at p. 310.) The prima facie showing is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. (*In re Zachary G*. (1999) 77 Cal.App.4th 799, 806.) In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re Jackson W*. (2010) 184 Cal.App.4th 247, 258.) The petition must be liberally construed in favor of its sufficiency. (Cal. Rules of Court, rule 5.570(a); *In re Marilyn H*., *supra*, at p. 309.)" (*In re J.P*. (2014) 229 Cal.App.4th 108, 127.)

**C. Changed Circumstances**

We assume for purposes of our discussion that the section 388 petition was properly before the court. Still we discern no error.

15.

We note the JV-180 request form asks, "What has happened since that order that might change the judge's mind?" Mother indicated the following: "I have continued to attended [*sic*] therapy, now focusing on issues of domestic violence, completed parenting class (which was done at the time the court terminated services) maintained my independence (now living alone), maintained employment, filed for divorce, ended my relationship with my child's father, which is a permanent clear decision supported by much insight I have gained in therapy with Ms. Cose."

Cose, according to mother's counsel's offer of proof on April 11, 2014, reported "a change." Cose's letter of March 5, 2014, clearly references changing circumstances— ongoing and continuing change by mother—rather than changed circumstances.

As the court indicated, it was already aware of nearly all of the circumstances identified by mother in the request; it noted the only change was that mother had attended three additional therapy sessions. Thus, the court considered those three sessions and Cose's opinion[8] that mother had a better understanding of the dynamics of domestic violence to be "some change," but that "some change" did not amount to changed circumstances necessitating a change in the court's prior order.

Further, "the change of circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged prior order." (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485.) We find no fault with the juvenile court's characterization of the change here to be "some change." It is not change of a significant nature necessitating the setting aside or modification of the juvenile court's order terminating reunification services. Mother's *changing* circumstances do not constitute *changed* circumstances. (See *In re Mickel O*. (2011) 197 Cal.App.4th 586, 615.)

---

[8]Cose's letter of March 5, 2014 is appended as exhibit A to the request.

16.

The correct measure of changed circumstances looks to the causes of a child's dependency and whether circumstances have changed significantly enough to no longer warrant the child's out-of-home placement. (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1343.) At two months of age, Naomi suffered traumatic injuries while in her parents' care. And while mother had arguably come to realize Naomi's injuries were not accidental and had been inflicted by father, the record establishes there were legitimate concerns surrounding the truth of mother's acceptance of those facts. A juvenile court can properly consider the "entire factual and procedural history of the case" in making its determination. (*In re J.P.*, *supra*, 229 Cal.App.4th at p. 127.) It is plain from the record the court did so and found mother's circumstances lacking. "[C]hildhood does not wait for the parent to become adequate." (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) Mother made positive strides but the court determined those efforts did not amount to changed circumstances within the meaning of section 388. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 48 [mother's short drug recovery period and failure to complete prior treatment programs showed only changing circumstances].)

### D.    Best Interests

Next, the JV-180 request form asks, "Why would the requested order or action be better for the child or youth?" Mother responded: "My child and I have a bond. I love my child and her entire extended family loves her. I believe that it is a positive and long term benefit that my child is with her biological mother. I am dedicated to being a single parent and to care, educate and love her to be a happy and healthy girl." Mother's declaration appended to the request provided specific information about their visits and Naomi's responses thereto, the fact mother filed for divorce and was living independently, that she had applied for a professional dental assisting license, continued to attend therapy with Cose, and that she intended to stay away from Naomi's father.

Even assuming changed circumstances had been found, that is not enough. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.) Both a change in circumstances and the

promotion of the child's best interests must be shown. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431-432.) Nothing in mother's request, nor in the offer of proof by mother's counsel, established that an "'undoing of the prior order would be in the best interests of the child.'" (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615.) Certainly Cose's letter of March 5, 2014, did not state that placing Naomi with mother would be in Naomi's best interests. In fact, it can be reasonably inferred from the letter that Cose believed significant work remained to be done by mother. Mother's counsel's offer of proof does not clear the hurdle either. Counsel asserted that Cose would testify to "supporting more time for the mother and the child," and that given mother's recent insights regarding domestic violence, she saw "a change." Naomi's best interests were not specifically addressed.

"[T]here is a rebuttable presumption that, in the absence of continuing reunification services, stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers. [Citation.] To rebut that presumption, a parent must make some factual showing that the best interests of the child would be served by modification." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 465.)

Naomi's need for permanence and stability were paramount. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254; *In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) The record reveals Naomi was thriving in her foster placement and her foster parents wished to adopt her. And reunification services had already been terminated. Mother simply did not make a factual showing that Naomi's best interests would be served by modifying the court's earlier order. Naomi's need for permanency and stability rightly prevailed.

Finally, because mother failed to make the required prima facie showing, her due process rights were not violated.

Given the foregoing, we cannot say the court abused its discretion in denying mother's petition. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.)

## II. Beneficial Parent-Child Relationship Exception

Mother asserts substantial evidence does not exist to support the juvenile court's finding that the parent-child benefit exception should not apply here. We disagree.

To reiterate, once the juvenile court has terminated reunification services, its focus shifts to the child's needs for permanency and stability. (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) If the child is likely to be adopted, adoption is the norm. (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The statutory presumption is that termination is in the child's best interests and not detrimental. (§ 366.26, subd. (b); *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1342.)

The juvenile court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances in section 366.26 provides a compelling reason for finding that termination of parental rights would be detrimental to the child. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.) It is an opposing party's burden to show termination would be detrimental under one of the statutory exceptions. (*In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 809.)

We review the juvenile court's decision regarding the applicability of exceptions to the adoption preference for an abuse of discretion. (See *In re C.B.* (2010) 190 Cal.App.4th 102, 123; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) "When applying the deferential abuse of discretion standard, 'the [juvenile] court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citations.]" (*In re C.B.*, *supra*, at p. 123.)

The beneficial parent-child relationship exception in section 366.26, subdivision (c)(1)(B)(i) involves a two-part test: did the parent maintain regular visitation and

contact with the child, and would the child benefit from continuing the relationship. For the exception to apply,

> "the parent-child relationship [must] promote the well-being of the child to such a degree that it outweighs the well-being the child would gain in a permanent home with new, adoptive parents. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) A juvenile court must therefore: 'balance[] the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1342.)

Here, there is no question mother maintained regular visits with Naomi. Further, her testimony suggested the visits were pleasant, loving occasions for both of them. The maternal grandmother's testimony reflected the same. However, interaction between a natural parent and child will always confer some incidental benefit to the child. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Consequently, a parent must demonstrate more than pleasant visits or frequent and loving contact for the beneficial parent-child relationship exception to apply. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 953-954.)

Our focus concerns whether Naomi would benefit from a continuing relationship with mother. We find no fault with the juvenile court's determination.

> "At the time the court makes its determination, the parent and child have been in the dependency process for 12 months or longer, during which time the nature and extent of the particular relationship should be apparent. Social workers, interim caretakers and health professionals will have observed the parent and child interact and provided information to the court. The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-576.)

Naomi was born in November 2012 and was placed with a foster family in February 2013 following severe injuries inflicted while she was under mother and father's care in January 2013. At the time of the court's determination, Naomi was approximately 16 months old and had lived apart from mother for more than one year. On the other hand, Naomi had lived with her foster parents for more than 10 months. Further, while the log notes following mother's monitored visits with Naomi generally reflect positive interaction, those same log notes indicate Naomi was not negatively affected by mother's departure at the end of the visitation sessions. Shahbazian testified she had no concerns that Naomi was having any difficulty leaving after the visits with her mother. Mother herself testified that Naomi did not cry at the end of every visitation. Between December 2013 and April 2014, mother indicated Naomi cried once. On her most recent visit, mother testified Naomi "was calm, but she did seem a little sad" when the visit was over.

Additionally, there was evidence that following termination of reunification services, mother told Shahbazian that Naomi did not know her anymore and was a stranger. This was a basis for mother's requests for increased visitation with Naomi.

Although she claims otherwise, mother is essentially asking this court to reweigh the evidence considered by the juvenile court. This we will not do. "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citations.]" (*In re Casey D.*, *supra*, 70 Cal.App.4th at pp. 52-53.)

The fact the social worker did not personally observe the interactions between mother and Naomi for a lengthy period of time does not require reversal. Shahbazian acknowledged she observed mother and Naomi on two occasions. She also testified she reviewed the visitation log notes compiled by the visitation staff at the children's crisis

21.

center in making her recommendation that mother's parental rights be terminated. The juvenile court was entitled to find Shahbazian's testimony credible and to give greater weight to Shahbazian's assessments and testimony. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)

Significantly, too, the record establishes Naomi was "thriving in the care of her foster parents." The foster parents had an "especially tight bond with Naomi" and "[a]bsolutely" wished to adopt her. They were "fully committed to providing Naomi the permanency of adoption," and an approved adoption home study was on file with the agency. Foster father Timothy P. testified concerning his observation of Naomi and mother at a medical appointment. More particularly, he testified Naomi could not be consoled by mother following a screaming fit at the doctor's office. Naomi became distraught and only calmed when Timothy held her. On that occasion, mother told Timothy that Naomi appeared more comfortable with him. Foster mother Jennifer P. observed mother and Naomi on several occasions, including a number of doctor visits. While Jennifer did not observe Naomi reach out for mother to hold her, Naomi did sit comfortably on mother's lap and was generally happy in her presence.

Simply put, mother did not meet her burden of showing that termination of her parental rights would be detrimental to Naomi. (*In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 809.)

In sum, the record establishes the juvenile court carefully balanced the strength and quality of mother's relationship with Naomi, and the tenuousness of that placement given mother's history and behavior, against the security and the sense of belonging Naomi's prospective adopters would provide to her. The juvenile court's decision is neither arbitrary nor capricious. It did not abuse its discretion. (*In re C.B.*, *supra*, 190 Cal.App.4th at p. 123.)

22.

## III. Visitation Concerns

Mother contends that because "artificial restrictions" were placed upon mother's visitation—such as monitored visits only twice monthly—the agency should be estopped from arguing she was afforded an opportunity to form a meaningful bond with her child. Mother complains the juvenile court "fail[ed] to assume its responsibility to ensure the agency had provided frequent and extensive visitation between" mother and Naomi. She contends the agency "should be estopped and not allowed to present the very condition it created as a basis to argue the denial of the parental/child beneficial relationship exception."

We find mother has failed to support a portion of her argument as required by the California Rules of Court. Further, we find she has forfeited the visitation issues for purposes of this appeal by a failure to object.

### A. Procedural Deficiencies

"'[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived and pass it without consideration.'" (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) Further, where a party fails to support an appellate argument with the necessary citations to the record, the argument will be deemed to have been waived. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Sky River LLC v. Kern County* (2013) 214 Cal.App.4th 720, 741; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)

Mother has failed to provide legal authority in support of her first argument pertaining to visitation appearing at pages 38 through 39 of her opening brief. Nor does she provide any citation to the record whatsoever. As a result, we treat this argument as waived and have not considered it.

### B. Failure to Object

On December 12, 2013, following contested hearing proceedings, the court set the matter for a section 366.26 hearing. The issue of visitation was addressed after the court

23.

terminated further reunification services: "As to the case plan, I don't see why the mother couldn't have twice-monthly visits with Naomi between now and the .26 hearing. So instead of one time a month [as recommended], we will provide for two times per month for the mother."

Significantly, mother's complaints that the agency did not articulate a basis for "just twice-monthly visits" and that no reason was proffered for those visits remaining monitored were not argued below. Nor were those complaints raised in either of her extraordinary writ petitions.

Dependency cases are not exempt from forfeiture or waiver rules. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2.) Those rules have been repeatedly and consistently applied in dependency cases. (E.g., *In re Meranda P*. (1997) 56 Cal.App.4th 1143, 1157-1158 [mother waived right to counsel claim]; see *In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 956, fn. 8 [adequacy of assessment report not raised below]; *In re Urayna L.* (1999) 75 Cal.App.4th 883, 886 [mother waived objection to department report]; *In re Janee J*. (1999) 74 Cal.App.4th 198, 209-210 [mother waived lack of notice claim]; *Armando D. v. Superior Court* (1999) 71 Cal.App.4th 1011, 1024 [father waived evidentiary objections]; *In re Shelley J*. (1998) 68 Cal.App.4th 322, 328 [mother waived insufficiency of dependency petition allegations]; *In re Cynthia C*. (1997) 58 Cal.App.4th 1479, 1484, fn. 5 [objection to removal order waived by failure to challenge below]; *In re Kevin S*. (1996) 41 Cal.App.4th 882, 885 [mother waived right to contest finding of reasonable reunification efforts by not objecting in trial court]; *In re Anthony P*. (1995) 39 Cal.App.4th 635, 640-642 [failure to raise sibling visitation issue in superior court]; *In re Mark C*. (1992) 7 Cal.App.4th 433, 445-446 [father's failure to pursue issue waived claim expert psychological testimony should have been admitted at dispositional proceeding]; *In re Daniel C.H*. (1990) 220 Cal.App.3d 814, 836 [failure to object to amendments to pleadings]; *In re Amos L*. (1981) 124 Cal.App.3d 1031, 1038 [no objection to inadequacy of social study].) As the California Supreme Court explained,

"[A]pplication of the forfeiture rule is not automatic. [Citations.] But the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue. [Citations.] Although an appellate court's discretion to consider forfeited claims extends to dependency cases [citations], the discretion must be exercised with special care in such matters. 'Dependency proceedings in the juvenile court are special proceedings with their own set of rules, governed, in general, by the Welfare and Institutions Code.' [Citation.] Because these proceedings involve the well-being of children, considerations such as permanency and stability are of paramount importance. (§ 366.26.)" (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293.)

We see no reason to excuse the forfeiture here. By failing to object to the visitation order of December 12, 2013, mother has forfeited the issues complained of on appeal.

## IV. Equal Protection

Finally, mother asserts a violation of the equal protection clause because section 366.26, subdivision (h)(1) does not apply equally to all children. She contends it favors older children and discriminates against babies and infants because the wishes of children unable to speak are not considered. The agency argues mother has waived the right to raise this issue by failing to object below. Furthermore, it contends section 366.26, subdivision (h)(1) does not violate the equal protection clause. In her reply brief, mother contends the issue is properly before this court because the juvenile court commented upon the subject.

We find this argument, too, has been forfeited by mother's failure to raise an equal protection argument below. As previously indicated, the forfeiture doctrine is applicable to dependency cases. (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293; *In re Meranda P.*, *supra*, 56 Cal.App.4th at pp. 1157-1158.) A review of mother's argument to the court following the testimony proffered at the section 366.26 hearing reveals no such argument was asserted.

Nevertheless, mother claims that the following comments, *by the court*, allow for her argument on appeal:

25.

"[THE COURT:] And I know that [mother's counsel] tried to show that Naomi looks to the mother for assistance and these types of things. But the situation is, unfortunately, Naomi was only two months when she was removed. And a lot of times when we look at the parent/child exception, we look at a child who is older, who has spent substantial time in the care of the parents, and there really is the potential to be able to prove that type of bond."

Mother offers no legal authority for the rather awkward proposition that a *court's comments* can be used to overcome or excuse a *party's failure* to raise a particular issue during argument in order to assert that argument on appeal. In any event, we hold otherwise. Mother may not overcome her own failure to argue a violation of the equal protection clause below by pointing to the court's language that, when viewed in context, did not contemplate any argument concerning the equal protection clause.

Hence, mother has forfeited her claim on appeal that section 366.26, subdivision (h)(1) violates the equal protection clause, and we did not consider it.

**DISPOSITION**

The order terminating mother's parental rights is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
POOCHIGIAN, Acting P.J.


_____
OLIVER, J.*

_____

*Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.