Filed 3/15/23; Certified for Publication 3/27/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JOAQUÍN TORRES, as Assessor–Recorder, etc.,<br><br>    Plaintiff and Appellant,<br>v.<br>SAN FRANCISCO ASSESSMENT APPEALS BOARD NO. 1,<br><br>    Defendant and Respondent;<br><br><br>CHINA BASIN BALLPARK COMPANY LLC,<br><br>    Real Party in Interest and Respondent. | A162440<br><br>(San Francisco County<br>Super. Ct. No. CPF-19-516833) |

The San Francisco Assessment Appeals Board No. 1 (County Board) was charged with assessing the possessory interest of respondent China Basin Ballpark Company LLC (Taxpayer) in Oracle Park, the home baseball stadium of the San Francisco Giants (the Ballpark). Like hitting a major league curveball, this has proved to be a daunting task. The applicable regulations set forth three methods for valuing property for tax purposes, all

1

of which have limitations for purposes of valuing Taxpayer's property interest.  Taxpayer and appellant San Francisco Assessor-Recorder (Assessor) presented evidence relating to only one of these valuation methods, the cost method.  The County Board deducted from the assessed value the cost of funding a reserve to prevent functional obsolescence, a type of depreciation.  Although the County Board has substantial latitude in conducting this difficult assessment, this deduction was impermissible, and we will direct the trial court to remand the matter to the County Board for further proceedings.

LEGAL BACKGROUND

"Property subject to taxation must be assessed at its full value, which is defined as its full cash value or fair market value.  (Rev. & Tax. Code, §§ 110.5, 401.)  ' "[F]ull cash value" or "fair market value" means the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used, and of the enforceable restrictions upon those uses and purposes.' (Rev. & Tax. Code, § 110, subd. (a).)" (*Sky River LLC v. County of Kern* (2013) 214 Cal.App.4th 720, 726 (*Sky River*).)

The determination of fair market value is governed and guided by two sources issued by the State Board of Equalization (State Board).  "The Legislature has authorized the state's Board . . . to prescribe rules and regulations to govern the operation and functioning of local tax assessors and boards of equalization.  (Gov. Code, § 15606.)  Those regulations are found in the California Code of Regulations, title 18." (*Sky River, supra,*

2

214 Cal.App.4th at p. 726, fn. 3.) In addition, the State Board "issues a handbook to 'serve as a primary reference and basic guide for assessors.' " (*Church v. San Mateo County Assessment Appeals Board* (2020) 52 Cal.App.5th 310, 316 (*Church*).) " 'Although assessors' handbooks are not regulations and do not possess the force of law, they . . .have been relied upon and accorded great weight in interpreting valuation questions. [Citation.] "The interpretations and opinions of an agency administrator, while not controlling upon the courts, constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. [Citation.] 'Because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this "expertise," expressed as an interpretation (whether in a regulation or less formally . . .), that is the source of the presumptive value of the agency's views.' " ' " (*Id.* at p. 323; accord, *Sky River, supra,* 214 Cal.App.4th at pp. 735–736.)

"There are three basic methods for calculating fair market value: (1) the comparative sales or market data method; (2) the reproduction or replacement cost method; and (3) the income method. (Cal. Code Regs., tit. 18, §§ 3, 4, 6, 8; [citation].)" (*Sky River, supra,* 214 Cal.App.4th at p. 726.) The regulations provide that, in determining fair market value, "the assessor shall consider one or more of" these approaches, "as may be appropriate for the property being appraised . . . ." (Cal. Code Regs., tit. 18, § 3;[1] see also *id.*, tit. 18, § 21(e) [valuation of taxable possessory interests is by one or more of

---

[1] Although the regulation lists five permissible valuation approaches (Cal. Code Regs., tit. 18, § 3), one is a variation of the comparative sales approach and two variations of the cost approach are listed separately; therefore, the "five methods . . . in fact reduce themselves to the same basic three." (1 Flavin, Taxing Cal. Property (4th ed. 2022 update) § 17:10, p. 507.)

3

the three basic methods].)  "Each approach, from a different perspective, simulates the thought processes of the typical buyer in a competitive market."  (State Bd. of Equalization, Assessors' Handbook (Jan. 2002) Basic Appraisal, p. 61 (hereafter Assessors' Handbook (Basic Appraisal)).)[2]

"In the comparative sales approach, the appraiser estimates market value by comparing the subject property to comparable properties of similar utility that have recently sold under competitive market conditions."  (Assessors' Handbook (Basic Appraisal), p. 61.)  The sale prices of comparable properties are adjusted for any differences between them and the property being assessed, for example, different market conditions, such as a shift in supply or demand, or different physical characteristics.  (*Id.* at pp. 88–89, 91–92.)  "[T]he validity of this method rests upon the assumption that comparable properties have comparable full cash values."  (*Bret Harte Inn, Inc. v. City and County of San Francisco* (1976) 16 Cal.3d 14, 24 (*Bret Harte*).)

"Using the income approach, an appraiser 'estimates the future income stream a prospective purchaser could expect to receive from the enterprise and then discounts that amount to a present value by use of a capitalization rate.' "  (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 604 (*Elk Hills*).)  The income to be capitalized is the anticipated "net return,"

---

[2] Where, as here, the property interest being valued is a possessory interest in publicly owned land, the valuation approaches take into consideration the taxpayer's reasonably anticipated term of possession.  (Cal. Code Regs., tit. 18, § 21(d)–(e).)  Thus, "the conventional approaches [to valuation] must be modified to accommodate the finite duration of a taxable possessory interest and the corresponding fact that a portion of the fee simple interest in those rights, the reversionary interest, is retained by the public owner and is nontaxable."  (State Bd. of Equalization, Assessors' Handbook (Dec. 2002) Assessment of Taxable Possessory Interests, p. 23 (hereafter, Assessors' Handbook (Possessory Interests)).)

in other words, the gross income reduced by current and future expenses. (Cal. Code of Regs., tit. 18, § 8(c); see also Assessors' Handbook (Basic Appraisal), p. 96.) "The income method rests upon the assumption that in an open market a willing buyer of the property would pay a willing seller an amount approximately equal to the present value of the future income to be derived from the property." (*Bret Harte, supra,* 16 Cal.3d at p. 24; see also Assessors' Handbook (Basic Appraisal), p. 6 ["The premise [of the income method] is that present value is a function of future benefits or income."].)

"Under the replacement cost approach, the tax assessor values the property 'by applying current prices to the labor and material components of a substitute property capable of yielding the same services and amenities' and then applying a depreciation factor to arrive at a taxable base value. (Cal. Code Regs., tit. 18, § 6.)" (*Elk Hills, supra,* 57 Cal.4th at p. 604.) "Reproduction or replacement cost shall be reduced by the amount that such cost is estimated to exceed the current value of the reproducible property by reason of physical deterioration, misplacement, over- or underimprovement, and other forms of depreciation or obsolescence." (Cal. Code Regs., tit. 18, § 6(e).) "The cost approach to property valuation 'is based upon the economic principle of substitution,' which 'holds that a rational person will pay no more for a property than the cost of acquiring a satisfactory substitute.' " (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 839 (*Dreyer's*).)

"The most difficult aspect of the cost approach is estimating *depreciation*. In general, depreciation may be thought of as the difference between the present value of the worn or outmoded subject property and the present value of a hypothetical, newly built, modern property of equivalent utility." (State Bd. of Equalization, Assessors' Handbook (Dec. 1998)

Advanced Appraisal, p. 20 (hereafter, Assessors' Handbook (Advanced Appraisal)).)

The type of depreciation at issue here, functional obsolescence, "is the loss of value in a property caused by the design of the property itself. When the capacity of a property to perform the function for which it was intended declines, functional obsolescence begins.... Functional obsolescence may be attributable to changes of taste in the marketplace, changes in building construction techniques, or to poor initial design." (Assessors' Handbook (Basic Appraisal), p. 81.)

More than one of the three valuation approaches can be used to determine the value of a given property. "Each appraisal approach utilized should be carried out independently from the others.... If each approach to value is performed independently, the resulting value indicators[3] will define a value range and allow a rational and defensible final estimate of value." (Assessors' Handbook (Basic Appraisal), p. 73.)

Selecting the final estimate of value from that range is done by a process called reconciliation. "The final analytical step in the appraisal process is to reconcile value indicators from the separate approaches utilized into a final estimate of value. Resolving the differences among the value indicators is called *reconciliation*. The result of reconciliation is the final value estimate."[4] (Assessors' Handbook (Basic Appraisal), p. 110.) "In the

---

[3] The Assessors' Handbook does not define the term "value indicator," but appears to use it to mean a preliminary determination of a property's fair market value resulting from one of the valuation approaches.

[4] A form of reconciliation may also occur while conducting one of the valuation methods. "Since more than one value indicator may be developed within a single approach to value, reconciliation occurs both within and among the value approaches. In the comparative sales approach, for example, each comparable sale produces an adjusted sale price, which is,

reconciliation process, consideration should be given to factors influencing value that are either not reflected or only partially reflected in the indicators. . . . The greatest weight should be given to that approach or combination of approaches that best measures the type of benefits the subject property yields." (*Ibid.*)

## FACTUAL AND PROCEDURAL BACKGROUND

The Ballpark sits on public land that Taxpayer leases. The Ballpark was completed in 2000 and, since 2001, Taxpayer and Assessor have hotly disputed the property tax valuation of Taxpayer's possessory interest. Taxpayer appealed Assessor's valuations for 2001–2003 to the County Board.[5] Following litigation, in 2006, the parties reached a settlement for tax years 2001–2010, approved by the County Board. The settlement agreement applied the cost method to determine value.

After the expiration of the settlement agreement, Taxpayer appealed Assessor's valuation for tax years 2011–2014 to the County Board. The County Board held a 12-day hearing at which the parties presented evidence and argument under both the cost and income approaches; both sides agreed there were not enough comparative sales to support that approach. In its written decision, the County Board applied both the income and cost approaches to arrive at two conclusions of value.

---

technically, a separate indicator of value." (Assessors' Handbook (Advanced Appraisal), p. 108.)

[5] "The county board of supervisors, or one or more assessment appeals boards created by the county board of supervisors, shall constitute the county board of equalization for a county," and "shall equalize the values of all property on the local assessment roll by adjusting individual assessments." (Cal. Const., art. XIII, § 16.)

As part of its analysis under the cost approach, the County Board "agreed with the parties that the [Ballpark] had experienced no functional obsolescence as of the lien dates." Nonetheless, the County Board "found that fan and advertiser expectations require ongoing capital improvements and renovations beyond ordinary maintenance, and that a reasonable and prudent buyer would anticipate that these costs during the term of possession could equal $300 million." The County Board assumed Taxpayer "would begin funding a contingency reserve starting in 2018" to fund these future costs, and discounted the net present value of equal annual installments from 2018 until 2042, the anticipated end of possession, "as a necessary expense to prevent functional obsolescence."[6] In reconciling the values determined by the cost and income approaches, the County Board found neither approach "was completely persuasive" and reached a final conclusion of value in between the two values. Neither party sought judicial review of the County Board's decision.

Taxpayer next returned to the County Board in an appeal of Assessor's determination of value for the 2015–2017 tax years, the proceedings at issue here. Before the County Board hearing, the parties stipulated that "the cost approach alone would provide the [County] Board with a sufficiently reliable indicator of value for it to reach a conclusion regarding the total assessed value" and, therefore, "the parties will rely exclusively on the cost approach

---

[6] The County Board selected 2018 because that was the date by which Taxpayer was "expected to finish repaying [its] construction loan." We note that "property tax appraisal is based on a hypothetical market transaction with a hypothetical buyer, not the taxpayer's peculiar benefits or predicaments unrelated to the market." (*Mola Development Corp. v. Orange County Assessment Appeals Bd.* (2000) 80 Cal.App.4th 309, 326.) As noted *post,* in the current proceedings the County Board assumed the reserve would be funded starting in 2015.

8

to determine the parties' respective opinions of value." The County Board accepted the stipulation but "retained the right to seek additional information—relating to any valuation approach—regarding the valuation of subject property . . . ."

In its written decision following the four-day hearing, the County Board agreed that "the cost approach is the most appropriate for this case." Using the cost approach, the County Board made findings as to the land value, replacement cost, and physical deterioration, none of which are challenged by the Assessor. The County Board then turned to functional obsolescence: "The [County] Board agreed with the parties that the [Ballpark] had experienced no functional obsolescence as of the lien dates. However, as with the prior findings [regarding the 2011–2014 tax years], the [County] Board did deduct the cost of the substantial capital expenditures that it believed would be necessary to prevent functional obsolescence in the future. [Taxpayer] showed that fan and advertiser expectations will require ongoing capital improvements and renovations beyond ordinary maintenance, and that a reasonable and prudent buyer would anticipate these costs during the term of possession. Thus, the [County] Board assumed a buyer would account for this future cost by funding a contingency reserve through the anticipated term of possession." The County Board found the anticipated term of possession to be until 2042, assumed a buyer would fund a reserve in equal annual amounts from 2015 until 2042, and deducted the present value of the amount it found necessary to fund the reserve to prevent functional obsolescence—more than $180 million for each tax year.

Assessor filed a petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5) challenging the County Board's decision. The superior court denied the petition.

9

DISCUSSION

Assessor argues the County Board's deduction for the present value of the cost of funding a reserve to prevent future functional obsolescence is impermissible under the cost approach.[7]  We agree.

I.    *Standard of Review*

A county assessment appeals board's " ' "factual determinations are entitled on appeal to the same deference due a judicial decision, i.e., review under the substantial evidence standard." ' [Citation.]  However, when the appeals board purports to decide a question of law, the decision is reviewed de novo.  [Citation.]  'Where the [petitioner] claims a valid valuation method was improperly applied, the trial court is limited to reviewing the administrative record.  [Citation.]  The court may overturn the assessment appeals board's decision only if there is no substantial evidence in the administrative record to support it.  [Citation.]  However, where the [petitioner] challenges the validity of the valuation method itself, the court is faced with a question of law.  In such a case, the court does not evaluate whether substantial evidence supports the board's decision, but rather must inquire into whether the challenged valuation method is arbitrary, in excess of discretion, or in violation of the standards prescribed by law.' " (*Church, supra,* 52 Cal.App.5th at p. 321.)  " 'Whether a taxpayer is challenging "method" or "application" is not always easy to ascertain.  [Citation.]  If none

---

[7] The California Assessors' Association and California State Association of Counties filed an amici curiae brief in support of the Assessor, as did the Santa Clara Unified School District and Santa Clara County Office of Education.  We deny as irrelevant the Santa Clara Unified School District and Santa Clara County Office of Education's September 28, 2022 request for judicial notice of a rating action commentary for South San Francisco Unified School District.

10

of the facts are in dispute, what might otherwise appear to be a factual challenge, and therefore subject to substantial evidence review, is actually a legal challenge. [Citation.] " 'The issue is not whether the assessor misunderstood or distorted the available data, but whether [the assessor] chose an appraisal method which by its nature was incapable of correctly estimating market value.' " ' " (*Sky River, supra,* 214 Cal.App.4th at p. 729.)

Assessor argues his challenge is to the validity of the valuation method; Taxpayer argues the issue is whether the cost method was improperly applied. In *Bret Harte, supra,* 16 Cal.3d 14, an assessor, using the cost approach, deducted "50 percent for depreciation, regardless of the property's age or condition." (*Id.* at pp. 18–19.) The Supreme Court determined the taxpayer's challenge to this uniform deduction was a challenge to the validity of the valuation method, not to its application. (*Id.* at p. 23.) In contrast, in *Dreyer's, supra,* 218 Cal.App.4th 828, the assessment appeals board, using the cost approach, made no deduction for economic obsolescence after finding the taxpayer "did not present sufficient evidence to prove external factors created economic obsolescence." (*Id.* at p. 834.) The Court of Appeal reasoned, "The board found that the assessor carefully considered making the adjustment, but determined it was not warranted. Thus, the issue before the trial court was not one of law: Whether the cost method of valuation mandated making an underutilization adjustment [for economic obsolescence] in an appropriate case. Rather, the issue was one of fact: Whether on the evidence presented the board could conclude that [the taxpayer] failed to satisfy its burden of proving an underutilization adjustment was appropriate in this case." (*Id.* at p. 838.)

We agree with Assessor that this case, like *Bret Harte,* involves a challenge to the validity of the valuation method. Assessor does not contend

11

the County Board's deduction for the cost of funding a reserve to prevent future functional obsolescence was too high in light of the evidence; instead, he argues *any* such deduction, regardless of the evidence presented, is inconsistent with the cost approach. We therefore review whether the County Board's use of this deduction was arbitrary, in excess of discretion, or in violation of the standards prescribed by law.

II.     *Funding a Reserve to Prevent Future Functional Obsolescence*

Assessor argues the cost approach considers the replacement cost of a property at the time of valuation, and the County Board's consideration of future depreciation is therefore inconsistent with the cost approach. Taxpayer argues the ultimate question is what a prudent buyer would pay for the possessory interest, and substantial evidence supports the County Board's finding that a prudent buyer would consider the significant future expense of preventing the Ballpark's functional obsolescence when determining the amount to pay for the property.[8]

As Assessor argues, "the cost approach is not valid unless it is made as of a specific date." (Assessors' Handbook (Basic Appraisal), p. 84.) While the income approach is also made as of a specific date, it is inherently forward looking, and may therefore be generally better suited to consider a factor like future expenses. (See Assessors' Handbook (Basic Appraisal), p. 62 ["The income approach is primarily based on the principle of anticipation."]; Assessors' Handbook (Advanced Appraisal), p. 55 ["The principle of anticipation [fundamental to the income approach] states that value is

---

[8] The parties dispute whether the testimony of one of Assessor's witnesses supported the County Board's approach or not. As the issue is one of law, governed by the applicable authorities, the testimony of this witness is not material.

created by the anticipation of future benefits, which leads in fact to one definition of value as the present worth of future benefits."].)

Accordingly, one way to value Taxpayer's possessory interest would be to conduct the cost approach without considering future expenses. Those expenses could be taken into account by also conducting the income approach, and determining a final value through reconciliation.[9] Perhaps this would be the best way to determine the fair market value of Taxpayer's property interest. (See Cal. Code Regs., tit. 18, § 6(a) [cost approach "is used in conjunction with other value approaches" and "is particularly appropriate" for property that "is not affected by . . . depreciation or obsolescence"]; Assessors' Handbook (Advanced Appraisal), p. 13 ["where the subject property suffers from depreciation, the reliability of a value indicator determined by the cost approach may be severely limited"] & p. 108 ["Typically, more than one approach to value is used in an appraisal . . . ."].)

But this approach is not the only way; as the County Board has recognized, the property interest at issue is highly unusual and difficult to value. We do not read the governing statutes, regulations, and State Board guidance to prohibit all other methods of considering future expenses. Although the cost approach normally considers depreciation present at the time of valuation, we are not persuaded that it prohibits consideration of

---

[9] The Assessors' Handbook acknowledges that a given valuation approach may not consider all factors relevant to value and that this would be relevant to the reconciliation process. (Assessors' Handbook (Basic Appraisal), p. 110 ["In the reconciliation process, consideration should be given to factors influencing value that are either not reflected or only partially reflected in the indicators [resulting from each valuation approach conducted."].)

13

future depreciation when, as the County Board impliedly found, such future depreciation is knowable and known on the date of valuation.

Instead, the fatal flaw with the County Board's method is that it is not reasonably likely to approximate fair market value. (See *Bret Harte, supra,* 16 Cal.3d at p. 25 [the cost approach, "if it is to yield results consistent with the constitutional command that all property subject to taxation be assessed at full cash value, must be designed so that cost factors . . . are modulated by depreciation factors *in a manner reasonably calculated to achieve an approximation of such value with respect to the individual taxpayer*" (italics added)].) Under the cost approach, "In general, depreciation may be thought of as the difference between the present value of the worn or outmoded subject property and the present value of a hypothetical, newly built, modern property of equivalent utility . . . . Thus, in an appraisal sense, the term 'depreciation' refers not to a decline in the original value of the subject property, but rather to *a measurement of the extent to which the subject property is, at a particular point in time, worth less than a hypothetical new property*." (Assessors' Handbook (Advanced Appraisal), pp. 20–21, italics added.)

Ways of measuring depreciation set forth in the Assessors' Handbook illustrate this principle. For example, functional obsolescence requiring an item be added to the subject property is not measured simply by the cost to add that item; instead, it "is measured by how much the cost of the addition exceeds the cost of the item if it had been installed during the construction of the improvement—this is sometimes called the 'excess cost to cure.'" (Assessors' Handbook (Advanced Appraisal), p. 28.) This measure of depreciation maintains its focus on the difference in value between the current property and a hypothetical new property. Another example borrows

14

principles from the income approach to measure this difference: one way to measure depreciation is to "estimate the loss of rental income due to this cause of depreciation," based on the "premise that any loss in value of the property would also be reflected by a loss in either the amount or duration of rental income (actual or imputed) to the property." (Assessors' Handbook (Basic Appraisal), p. 84.) Again, this measure of depreciation is focused on the difference between the anticipated future income for the depreciated subject property and the anticipated future income for a hypothetical new property with no such depreciation.

The County Board's approach simply deducts the present value of funding a reserve to prevent future functional obsolescence, a specie of depreciation. But because the County Board found there was no current functional obsolescence, a hypothetical new stadium would have the same features as the Ballpark for purposes of functional obsolescence. Moreover, because the need to fund such a reserve would be known at the time the stadium was constructed, a hypothetical new stadium *would also need to fund a reserve to prevent future functional obsolescence*. Therefore, simply deducting the present value of funding that reserve to determine the fair market value of the Ballpark does not approximate the difference in value between the Ballpark and a hypothetical new stadium.[10]

---

[10] The parties dispute whether stadiums are worth the cost to build them; more specifically, should the fair market value of a new stadium reflect a need to fund a reserve to prevent future functional obsolescence. We need not weigh in on this issue. For present purposes it is sufficient that the County Board found, and Assessor does not dispute, that a reasonable buyer of the Ballpark would anticipate costs to prevent future functional obsolescence and would fund a reserve for this purpose. To the extent Taxpayer argues that replacement cost is not a good measure of fair market value, that simply counsels against sole reliance on the cost approach.

15

There may be a way to compare the current value of funding the reserve for the Ballpark with the current value of funding a reserve for a hypothetical new stadium. There may also be other means of measuring this future functional obsolescence that are reasonably calculated to approximate fair market value. For example, using principles from the income method, the metric could potentially be the net loss of income that would be caused by the future functional obsolescence if not remedied. There may be additional means of measurement; we do not direct any particular means be used here. We also acknowledge the imprecision inherent in the appraisal process: "The final value estimate is an appraiser's opinion of value. There is no mathematical formula or statistical technique to which the appraiser can ultimately refer in order to reach the final value estimate." (Assessors' Handbook (Advanced Appraisal), p. 111; see also Assessors' Handbook (Basic Appraisal), p. 110 ["a value indicator is usually far from perfect" and the analysis of value indicators "contain[s] an element of judgment"].)

We will remand to the trial court to vacate the County Board's decision and direct further proceedings. (*Sky River, supra,* 214 Cal.App.4th at p. 739 [" '[W]hen reviewing an equalization determination properly before it in a refund action, a court may correct an assessment and grant a tax refund *if value is calculable as a matter of law* without remanding to the county board of equalization. [Citations.] [¶] However, where a judgment must still be exercised as to value, a remand to the local board of equalization is required.' "].) Again, we do not hold any particular method of valuation is required.[11] The parties may raise arguments regarding proposed methods

---

[11] Although Taxpayer agreed to limit its evidence to the cost approach, the County Board reserved the right to solicit additional evidence under a different approach and may do so on remand.

16

with the County Board.  The County Board has significant latitude in determining how to appraise Taxpayer's property interest.  (*Church, supra,* 52 Cal.App.5th at p. 321 [reviewing court considers " 'whether the challenged valuation method is arbitrary, in excess of discretion, or in violation of the standards prescribed by law' "].)  However, to the extent the County Board continues to consider the cost of funding a reserve to prevent future functional obsolescence, it must do so by a means reasonably calculated to approximate the fair market value of Taxpayer's property interest.  The method used below failed to do that.  We leave it to the County Board to determine the appropriate steps on remand, not inconsistent with this opinion.

## DISPOSITION

The judgment is reversed and remanded to the superior court with instructions to grant the writ petition and issue a writ directing the County Board to vacate its decision and conduct further proceedings not inconsistent with this opinion.  Assessor shall recover its costs on appeal.

17

_____
SIMONS, J.

We concur.

_____
JACKSON, P. J.

_____
WISEMAN, J.*

(A162440)

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| JOAQUÍN TORRES, as Assessor–Recorder, etc.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO ASSESSMENT APPEALS BOARD NO. 1,<br><br>    Defendant and Respondent;<br><br><br>CHINA BASIN BALLPARK COMPANY LLC,<br><br>    Real Party in Interest and Respondent. | A162440<br><br>(San Francisco County<br>Super. Ct. No. CPF-19-516833)<br><br><br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION** |

BY THE COURT**:**

    The opinion in the above-entitled matter, filed on March 15, 2023, was not certified for publication in the Official Reports. For good cause, the request for publication, filed on March 21, 2023, is granted.

    Pursuant to California Rules of Court, rules 8.1105 and 8.1120, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

Date: ───03/27/2023───            ───Jackson, P.J.───,P. J.

1

Trial Judge:      Hon. Ethan P. Schulman

Trial Court:      San Francisco County Superior Court

Attorneys:

      David Chiu, City Attorney, Yvonne R. Meré, Chief Deputy City Attorney, Scott M. Reiber, Chief Tax Attorney, James M. Emery and Carole F. Ruwart, Deputy City Attorneys, for Plaintiff and Appellant.

      Vallejo, Antolin, Agarwal & Kanter LLP, Peter B. Kanter and Matthew J. Rilla for Real Party in Interest and Respondent.

      Parker & Covert LLP, P. Addison Covert for Santa Clara Unified School District and Santa Clara County Office of Education as Amici Curiae on behalf of Plaintiff and Appellant.

      James R. Williams, County Counsel, Douglas M. Press, Tony LoPresti, and Rachel A. Neil, Office of the County Counsel, County of Santa Clara for California Assessors' Association and California State Association of Counties as Amici Curiae on behalf of Plaintiff and Appellant.